UNITED STATES of America

v.

Matthew F. WHITAKER et al.
(two cases).

Cr. Nos. 70–324, 70–515.

United States District Court,
E. D. Pennsylvania.

May 31, 1972.

Louis C. Bechtle, U. S. Atty., George F. Kelly, Special Atty., U. S. Dept. of Justice, Philadelphia, Pa., for plaintiff.

Robert C. Duffy, Philadelphia, Pa., for Matthew F. Whitaker, Peter Smith, John Avella.

Norman C. Henss, Philadelphia, Pa., for James Whitaker, John Avella.

Robert G. Carr, Baltimore, Md., for Elaine Perrera, Michael C. Benicky.

Benjamin R. Donolow, Paul D. Sulman, Philadelphia, Pa., for Aldo Magnelli, Almond Magnelli.

Gilbert Abramson, Philadelphia, Pa., for William Wilson.

James J. Hogan, Miami Beach, Fla., for Peter J. Martino.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

We are involved here with two gambling cases. On June 17, 1970, Matthew F. Whitaker and a number of other people were indicted under Criminal No. 70–324, accused of making interstate telephone calls for the purpose of engaging in the business of bookmaking and gambling in violation of 18 U.S.C. § 1952. Matthew F. Whitaker, along with six other defendants, most of whom were not indicted under Criminal No. 70–324, was indicted on September 17, 1970 under Criminal No. 70–515 and charged with conspiracy to use telephone facilities for the carrying on of a gambling and bookmaking business, as well as other substantive offenses not included in the first indictment. 18 U.S.C. § 371, 18 U.S.C. § 1952, 18 U.S.C. § 2.

The government has given notice to the defendants that it intends to use at the trial of these cases the recordings of wiretaps made on the telephone of the defendant, Matthew F. Whitaker, pursuant to an order signed by then Chief Judge John W. Lord, Jr. on October 6, 1969 under the authority of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (hereinafter referred to as "Title III"). In each of the actions many of the defendants have filed motions to suppress the contents of intercepted telephone communications seized pursuant to wiretapping done under that order, as well as any other evidence obtained by the government by virtue of the wiretapping. Motions to suppress were filed in Criminal No. 70–324 by defendants Matthew F. Whitaker, James Whitaker, Peter J. Martino (who has since pleaded guilty), John Avella, Elaine Perrera, and Michael C. Benicky. In Criminal No. 70–515 the motions were made by Matthew F. Whitaker, James Whitaker, William Wilson, Peter Smith, Aldo Magnelli, and Almond Magnelli. Some of the defendants have filed other motions which we find it unnecessary to rule upon because of our conclusion that the motions to suppress should be granted.

Defendants have raised a number of grounds in support of their motions to suppress. Since we are granting these motions because we have found Title III to be unconstitutional on its face we will

first indicate why we rejected the other arguments advanced by the defendants so that it became necessary to reach the question of constitutionality.

## AUTHORIZATION OF THE APPLICATION

Congress has provided in 18 U.S.C. § 2516(1) that applications to a federal judge for an order authorizing the interception of wire or oral communications can be made only when first authorized by the Attorney General or an Assistant Attorney General specially designated by him. In United States v. Robinson, 40 U.S.L.W. 2454 (C.A.5, Jan. 12, 1972), a Title III wiretap was held invalid because neither the Attorney General of the United States nor any Assistant Attorney General ever personally participated in authorizing the application for the Title III wiretap involved in that case. United States v. Baldassari, 338 F. Supp. 904 (M.D.Pa.1972). Our case is different, however, because the then Attorney General, John M. Mitchell, personally initialled a memorandum concerning the application for the order in the instant case. Many courts have concluded that an initialled memo by the Attorney General is sufficient authorization to meet the requirements of 18 U.S. C. § 2516(1). United States v. Pisacano, 459 F.2d 259 (C.A.2, 1972); United States v. D'Amato, 340 F.Supp. 1020 (E.D.Pa., 1972); United States v. Cantor, Crim.No. 70–454 (E.D.Pa., 1972); United States v. Aquino, 338 F.Supp. 1080 (E.D.Mich., Jan. 17, 1972); United States v. LaGorga, 336 F.Supp. 190 (W. D.Pa.1971). We think these decisions are sound if the action of the Attorney General can be interpreted as an authorization of the application.

" * * * [T]he memorandum (initialled by Mitchell) would have to be analyzed to determine if the Attorney General had actually authorized the wiretap or had only specially designated an Assistant Attorney General

to authorize it; in other words, in each case the court must determine if the Assistant Attorney General was delegated the power to authorize, or whether the Attorney General had authorized the wiretap and the Assistant Attorney General merely conveyed that notice of that decision." United States v. Narducci, 341 F.Supp. 1107 (footnote 9) (E.D.Pa., 1972) (dictum) (Becker, J.)

■ In making this determination, we think that both the memorandum and the surrounding circumstances should be considered. In this case, according to the affidavit of Deputy Assistant Attorney General Henry E. Peterson,[1] he forwarded to the office of the Attorney General the file on the proposed application which contained the suggested application, along with a proposed affidavit and order and a detailed recommendation that authorization be given. Attorney General Mitchell responded with a memo which he personally initialled where he described the proposed application in detail and indicated that Will Wilson, Assistant Attorney General, was specially delegated to authorize Richard T. Spriggs, a U. S. Attorney, to make the application. Literally reading the memorandum, we could find that Attorney General Mitchell only delegated authority to authorize the application, and did not himself authorize the application, but this would be to elevate semantics above reality. The Attorney General's memorandum was issued after he had been presented with the proposed affidavit, application and order, as well as a detailed recommendation. There certainly was enough information before the Attorney General for him personally to authorize the application, and we conclude that the approval of the application as expressed in his memorandum was in effect his personal authorization, and that the requirements of 18 U.S.C. § 2516(1) have been fulfilled. See United States v. Cafero, Crim. No. 70–445 (E.D.Pa., May 5, 1972) (Fullam, J.).

1. Under 18 U.S.C. § 2516(1) he could not himself authorize a Title III application since he was a Deputy Assistant Attorney General rather than an Assistant Attorney General or Attorney General.

Both the application and order in this case do not state that Attorney General Mitchell authorized the application. They both indicate that he specially delegated Assistant Attorney General Will Wilson who in turn authorized the application. In fact, Will Wilson did not in any way participate personally in the authorization of the application.[2]

■ It is provided in 18 U.S.C. § 2518 (1) (a) that each application shall include the identity of the officer authorizing the application. Likewise, it is provided in 18 U.S.C. § 2518(4) (d) that the order identify the authorizing officer. The application and order in this case misidentified Assistant Attorney General Will Wilson as the authorizing officer. The question is whether this deviation from the statutory provisions provides a basis for suppressing the contents of the intercepted telephone communications. We think not. Contra, United States v. Focarile, 340 F.Supp. 1033 (D.Md., 1972). *See also*, United States v. Casale, 341 F.Supp. 374 (M.D. Pa., 1972). We can discern no prejudice whatsoever because the person who actually authorized the application, Attorney General John M. Mitchell, was erroneously identified as Assistant Attorney General Will Wilson. Obviously, the judge who issued the order would have acted no differently if informed that Attorney General Mitchell authorized the application. The important thing is that there was an authorization by the Attorney General or one of the Assistant Attorneys General in compliance with 18 U.S.C. § 2516(1) which insures that every such application receive the personal attention of at least one of a small number of designated individuals appointed by the President and confirmed by the Senate.[3] *See* United States v. Robinson, 40 U.S.L.W. 2454 (C.A.5, Jan. 12, 1972).

"Having concluded that the Justice Department's procedures were very likely consistent with the mandate of § 2516(1), we would not be inclined to rule that the authorizations were nevertheless invalid in light of 28 U.S.C. § 2518(1) (a) & (4) (d) which require that the application and the court order indicate the officer authorizing the application. While Will Wilson was identified as the authorizing officer when in fact the Attorney General or Mr. Lindenbaum had approved the applications, this discrepancy did not meaningfully subvert the congressional scheme. * * * Perhaps the procedures adopted by the Justice Department were not the best for ascertaining the official who exercised the 'responsibility' for authorizing applications as prescribed in § 2516(1); but, * * * that procedure does nonetheless ensure that the responsible official be reasonably identifiable." United States v. Pisacano, 459 F.2d 259 (footnote 5) (C.A.2, 1972) (dictum) (Friendly, J.).

## PROBABLE CAUSE

■ Movants contend that there was no probable cause for issuance of the order authorizing the wiretapping in the instant case. The affidavit used by the government as the basis for its application is alleged to be insufficient to establish probable cause, thus it is contended that the order authorizing the wiretap was in violation of the Fourth Amendment.

The affidavit was that of Richard C. Fritz, a Special Agent of the Federal Bureau of Investigation. His affidavit is based on information from four confidential informants, plus information he developed from a personal investigation in which he tried to corroborate the dis-

2. The mistaken assumption of Will Wilson's involvement was created by a letter of authorization purportedly signed by Will Wilson. Henry E. Peterson, Deputy Assistant Attorney General, had signed Wilson's name in accordance with Wilson's general instructions regarding the execution of letters of authorization after approval of the particular application from the Office of the Attorney General.

3. There are nine Assistant Attorneys General. 28 U.S.C. § 506.

closures given to him by the confidential informants.

In itself, the information supplied by informants #1, #2 and #3 does not form any basis for establishing probable cause. Though there is a showing concerning each one as to his reliability as an informer, none of the information supplied by these informers stemmed from personal observation. Each simply related to Agent Fritz what he had heard from some unidentified individual. As to these real sources of information who talked to informants #1, #2 and #3, there is an insufficient showing of reliability. *See* Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). No weight can be given to the information supplied by these informants toward establishing probable cause because it is hearsay on hearsay. *See* United States v. Roth, 391 F.2d 507 (C.A. 7, 1967).

However, the information supplied by confidential informant #4 stands on a different footing, and along with corroborating facts developed in Agent Fritz's personal investigation, establishes probable cause. Informant #4's reliability is established by the affidavit's allegation that within the past seven months before the application was submitted, he had been providing information relative to gambling. He had done so on approximately ten occasions, with it invariably being found accurate when checked by further investigation. Not present here are the bare conclusory allegations of reliability condemned in Aguilar, *supra*, and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), as underlying circumstances for finding the informant reliable were disclosed to the issuing judge.

Informant #4 concluded that Matthew F. Whitaker was engaged in bookmaking on sporting events on an intrastate and interstate basis, identifying two particular phone numbers which he used for receiving and placing wagers. The apartment in which he used these phones was also named. Furthermore, informant #4 stated that in using these telephone numbers, in order to avoid detection of the interstate nature of his wagering activity, Matthew Whitaker would charge all of his interstate gambling calls to a Pennsylvania Bell Telephone Company credit card which was in another person's name. Besides the detail of the information, what makes it particularly reliable is the manner in which it was gathered. Confidential informant #4 stated that all his information was learned by him during conversations which he had directly with the subject of the wiretap application, Matthew F. Whitaker. In addition, a check of the toll records for the credit card mentioned by informant #4 disclosed a large volume of interstate telephone calls to various locations throughout the country, including certain named known gamblers. It is clear that the detailed information in this affidavit gained by a reliable informant from the suspect's own mouth comports with the requirements of the Fourth Amendment. See United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

## OTHER INVESTIGATIVE PROCEDURES

Movants contend that even if probable cause was established to believe that Matthew F. Whitaker was using telephones for an interstate bookmaking operation, the order authorizing the wiretap should not have been issued because the ineffectiveness of using other investigative procedures was not established by the affidavit.

■■■ Defendants rely on 18 U.S.C. § 2518(1) (c) which provides that each application shall include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." It is immediately apparent that this provision does not even require that any other investigative procedure be tried first before an order is issued for the interception of wire communications. It is not required that a wiretap be used as a last

resort, but only that the success of other methods of investigation appear unlikely. The burden on the government under this provision is not a great one, and it has been fulfilled here. The affidavit of Agent Fritz relates that all four of his informants have categorically refused to testify, and that there is not a single known witness who could be relied on to testify truthfully. Defendants contend that these known witnesses should have been subpoenaed to see whether they might tell the truth when forced to testify. It is apparent that this could very well have ended the usefulness of certain individuals as confidential informants, without an assurance of the dividends of truthful testimony. Moreover, the affidavit states that though a search warrant might result in the seizure of gambling records, these records would not show the source of the wagers, and thus would fail to disclose the interstate nature of the gambling operation.

> "Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. (Citations omitted.) What the provision envisions is that the showing be tested in a practical and commonsense fashion." S.Rep.No.1097, 90th Cong., 2d Sess., 1968, U.S.Code Cong. & Admin.News, pp. 2112, 2190.

The government has made a sufficient showing to meet the requirements of 18 U.S.C. § 2518(1) (c).

## CONSTITUTIONALITY OF TITLE III

■ Having rejected defendants' other grounds for suppression, we must now confront their argument that Title III is unconstitutional on its face. It is contended that the statute violates the First, Fourth and Fifth Amendments of the United States Constitution. Since

we have concluded that Title III violates the Fourth Amendment, a discussion of the other points raised becomes unnecessary.

Title III is a rather detailed statute. It conveys the surface impression that effective controls required by the Fourth Amendment have been placed on the government in its pursuit of evidence through the use of electronic listening devices. On closer scrutiny, however, we are convinced that the protections afforded the citizen against unreasonable governmental intrusions are largely illusory. If a judge exercised certain discretionary powers which the Act gives him, the order may not violate the Fourth Amendment. The difficulty, though, is precisely that those powers are discretionary and not mandated. It follows that the Act does not command a constitutional order; it permits an unconstitutional one.

Title III permits the government to conduct lengthy continuous searches with great discretion in the hands of the executing officers, thus violating the Fourth Amendment's prohibition against general searches.[4] Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); see Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); Marcus v. Property Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed. 2d 1127 (1961); Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

While Congress expressed an intention to shape Title III around the constitutional standards set forth in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and Katz v. United States, 389 U.S. 347, 88 S.Ct.

---

4. Many years ago, in the Court's first wiretapping case, Justice Brandeis, after evaluating the dangers of this type of intrusion on the citizen, concluded that "writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wiretapping." Olmstead v. United States, 277

U.S. 438, 476, 48 S.Ct. 564, 571, 72 L.Ed. 944 (1928) (dissenting opinion). In a separate dissenting opinion in *Olmstead*, Justice Holmes voiced his displeasure with the government being involved "in such dirty business." 277 U.S. at 470, 48 S.Ct. 564.

507, 19 L.Ed.2d 576 (1967), we find nothing in these decisions or previous decisions of the Court which provides constitutional support for the electronic surveillance contemplated by Title III.[5] The privacy of every citizen is in jeopardy if we become a nation which sanctions the indiscriminate use of secret electronic searches by the government.[6]

### A. Duration of the Search and Its Continuous Nature

In Berger, *supra*, the Court held that a New York eavesdropping statute was void on its face because it violated the Fourth Amendment, despite the fact that the New York law, like the statute now before us, required that electronic searches be conducted pursuant to a judicially approved warrant.[7] The Court found the statute to be constitutionally lacking in several respects.

One constitutional defect with which the Court was particularly concerned

was the unprecedented duration of the search permitted by the New York law. On a single authorization, eavesdropping could take place continuously for two months, with further extensions possible on a showing that it would be "in the public interest." In condemning the lengthy surveillance permitted under the New York statute, the Court held up as a model of electronic surveillance properly limited in scope and duration the judicially authorized eavesdrop which took place in Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). In that case, a man informed the Department of Justice that an attorney had initiated a discussion with him concerning the possibility of his approaching a juror in a pending criminal case. He executed a written statement under oath, and the Department of Justice then obtained court approval[8] to

---

5. We are aware of, but not convinced by, the many decisions which hold that Title III does not violate the Constitution. United States v. Cox, 449 F.2d 679 (C.A. 10, 1971), cert. denied 406 U.S. ——, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972) ; United States v. Focarile, 340 F.Supp. 1033, (D.Md., 1972) ; United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971) ; United States v. King, 335 F.Supp. 523 (S.D.Cal.1971) ; United States v. Lawson, 334 F.Supp. 612 (E.D.Pa.1971) ; United States v. Becker, 334 F.Supp. 546 (S.D.N.Y.1971) ; United States v. Perillo, 333 F.Supp. 914 (D.Del.1971) ; United States v. Leta, 332 F.Supp. 1357 (M.D.Pa.1971) ; United States v. Scott, 331 F.Supp. 233 (D.D.C.1971) ; United States v. Cantor, 328 F.Supp. 561 (E. D.Pa.1971) ; United States v. Sklaroff, 323 F.Supp. 296 (S.D.Fla.1971) ; United States v. Escandar, 319 F.Supp. 295 (S. D.Fla.1970), reversed on other grounds *sub nom.* United States v. Robinson, 40 U.S.L.W. 2454 (C.A.5, Jan. 12, 1972).

However, some of the commentators have found Title III to be unconstitutional. *E. g.*, Spritzer Electronic Surveillance By Leave of the Magistrate: The Case in Opposition, 118 U.Pa.L.Rev. 169 (1969) ; Schwartz, The Legitimation of Electronic Eavesdropping: The Politics of 'Law and Order', 67 Mich.L.Rev. 455 (1969). Justice Douglas has also indicated that he feels that Title III violates the Fourth Amendment. United States v. Cox (May 15, 1972) (dissenting opinion to denial of writ of certiorari).

6. "What is privacy, and why is it important to us?

"This question answers itself once we look at a society where privacy was systematically attacked and all but eliminated. Under Hitler and the Nazis, the destruction of the individual's sense of his own privacy was one of the principal methods used to gain state control over the German people. Wiretapping and electronic eavesdropping were high on the list of techniques used by the Gestapo. No one was safe from the listening ears of the secret police. Visitors to a German home were sometimes taken into the bathroom to exchange comments in whispers, because this was the most difficult room to tap. Diplomats and officials— and private citizens as well—met in public parks to escape eavesdroppers." U. S. Senator Edward V. Long, The Intruders 21 (1967).

7. Title III does contain an emergency provision, not considered here, which permits the electronic interception of communications without prior judicial approval in certain situations. 18 U.S.C. § 2518(7).

8. Actually, since one party to the communication here was consenting to its

wire the man for sound in his next meeting with the lawyer. Because the recorder did not operate properly at the initial meeting following judicial approval, another authorization was given to use the recorder at the next meeting. One conversation was recorded and introduced as evidence. " * * * [T]he order authorized one limited intrusion rather than a series or a continuous surveillance." Berger, *supra*, 388 U.S. at 57, 87 S.Ct. at 1883.

"Authorization of eavesdropping for a two-month period is the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause. Prompt execution is also avoided. During such a long and continuous (24 hours a day) period the conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard with their connection to the crime under investigation." Berger, 388 U.S. at 59, 87 S.Ct. at 1883.

Title III is an improvement over the New York statute in Berger as the time period for continuous electronic surveillance has been shortened. Under Title III, one showing of probable cause can sustain a 24-hour-a-day search for only 30 straight days. 18 U.S.C. § 2518 (5). Unlike the Berger statute, there must be a new showing of probable cause for each extension, which may also last 30 days. 18 U.S.C. § 2518(5). Title III provides no limit on the number of extensions, thus making possible continuous searches for months on end if a fresh showing of probable cause can be made once a month.[9]

"When it is necessary to conduct surveillance for a period of time longer than that specified, the provision provides for extensions. No arbitrary limit is placed on the number of extensions which can be obtained." S. Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2192.

Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), may have modified the Berger holding in some respects but we do not read it as giving approval to the lengthy continuous searches which can be conducted pursuant to Title III. In Katz, officers attached a listening device to a public telephone booth and listened to a gambler's conversations. They limited themselves to a matter of minutes each morning over a one-week period, exercising "great care to overhear only the conversations of the petitioner himself." Katz, 389 U.S. at 354, 88 S.Ct. at 513. Since this surveillance was conducted without warrant, the Court held that it violated the Fourth Amendment, but in the course of its opinion it indicated that the eavesdrop would have been constitutionally permissible if prior judicial approval had been obtained. " * * * [I]t is clear that this surveillance was so narrowly circumscribed that a duly authorized magistrate * * * clearly apprised of the precise intrusion it would entail, could constitutionally have authorized, with appropriate safeguards, the very limited search and seizure that the Government asserts in fact took place." Katz, 389 U.S. at 354, 88 S.Ct. at 513.

Katz gives no indication that the Court intended to overrule the constitutional objection to lengthy continuous surveillance expressed in Berger. Title III's intrusion is not "precise" nor "carefully circumscribed" nor "very limited". The fact that it permits 30-day continuous

interception, prior judicial approval was unnecessary. Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

9. The spectre of searches lasting well beyond 30 days is not at all farfetched.

The Senate Report apparently cites with approval a California case involving an electronic eavesdrop lasting 15 months. People v. Tarantino, 45 Cal.2d 590, 290 P.2d 505 (1955). S.Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2190.

searches which are only half as long as those condemned in Berger is a distinction without constitutional significance. This aspect of Title III alone renders the Act unconstitutional.

## B. Executing Officers' Discretion

Not surprisingly, considering the lengthy duration of Title III searches, far too much discretion to comport with Fourth Amendment requirements is placed in the hands of the officers executing the order. The Berger and Katz opinions both emphasize repeatedly the necessity for precise, limited, carefully circumscribed intrusions "established in advance by a specific court order." Katz, 389 U.S. at 356, 88 S.Ct. at 514. Unfortunately, while Title III is a vast improvement over the New York statute in Berger, it nevertheless allows the executing officers to conduct a broad investigative search, rather than a precise intrusion, as in Katz and Osborn.

Before a judge may issue a Title III order, he must first determine that there is probable cause to believe that an individual is committing, has committed, or is about to commit one of the particular offenses enumerated in § 2516 of the Act. 18 U.S.C. § 2518(3) (a). This requirement provides a protection not present in the Berger statute, keeping the government out of protected areas until it has made a constitutionally sufficient showing to justify the intrusion. It also serves to direct the search toward a particular crime, unlike the completely free-wheeling investigation which executing officers could conduct under the New York statute.

Unfortunately, except for this identification of the crime under investigation, little more by way of meaningful guidelines may be provided to the executing officer. The order must contain a "particular description of the type of communication sought to be intercepted * * *." 18 U.S.C. § 2518(4) (c). For example in this case, the crime under investigation was an interstate gambling operation, and the order described the type of communications sought as those involving the placing and accepting of bets and wagers on sporting events and horse races.

Unless there is a direction in the order, which can be inserted at the judge's discretion, that the interception must terminate when the described communication is first obtained, 18 U.S.C. § 2518 (4) (e), the executing officer will often be faced with an extremely difficult task. He will be left on his own for days on end, and somehow must determine when he has heard enough about the type of communications described in the order, such as sporting event and race horse wagers, so that he must stop the interception.[10] To describe the item to be seized by type may be particular enough when the search is of a building, since the duration of the search is limited by the size of the item and of the building itself, but such natural restrictions are not inherent in an electronic search of communications. See Steele v. United States, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925) (cases of whiskey). If the duration of the search is to be kept to the minimum necessary, as it must under the Constitution, then officers must be given more specific guidelines as to what they are listening for in the electronic search so that they can know with some degree of certainty when they have seized all that they are supposed to seize and must stop.[11]

10. We, of course, are referring to the order in this case only as an example of the constitutional problems presented by Title III. The judge who issues a Title III order may in his discretion require periodic reports during the interception showing what progress has been made toward the achievement of the authorized objection, but these reports are not required. 18 U.S.C. § 2518(6). The order in this case provided for a 15-day search with reports on the 5th and 10th days.

11. The problem with a description of the type of communications to be seized is really of a different order than the First Amendment one in Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). There the description did not provide proper guidance for the exe-

What makes the determination particularly difficult for the executing officers under Title III is the fact that the search will often be directed towards other individuals as well as the person named in the order. In both Osborn and Katz, only one end of a conversation was listened to involving a non-consenting party for whom probable cause to intercept had been established. Under this statute not only are both ends of the conversation being monitored without any consent, but often the very purpose of listening will be to obtain evidence against many individuals. This in fact is the justification offered for the lengthy duration of the surveillance permitted by Title III. "Where a course of conduct embracing multiple parties and extending over a period of time is involved, the order may properly authorize proportionately larger surveillance, but in no event for longer than 30 days, unless extensions are granted." S.Rep. No.1097, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Admin.News pp. 2112, 2190.[12]

Thus, Title III contemplates broad electronic investigations to gather evidence about a crime or crimes and its participants. It is left to the executing officers to determine when they have learned enough details concerning enough people about the offense in question so that they should and must stop their interception because the authorized objective

has been attained.[13] This is a far cry from the situation in Osborn where "once the property sought, and for which the order was issued, was found the officer could not use the order as a passkey to further search." [14] Berger, 388 U.S. at 57, 87 S.Ct. at 1882. The officers in Osborn were restricted to listening to a single conversation for the specific purpose of checking the truthfulness of an affidavit. While Title III is a significant improvement from the New York statute found unconstitutional in Berger, it still lodges too much discretion in the executing officers to comply with the Constitution.

Title III does provide for a direction in each order to the executing officers instructing them to limit the scope and duration of the search as much as possible.

"Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days." 18 U.S.C. § 2518 (5).

Such a general direction inserted in every order is not a constitutional substitute for specific pre-search controls

cuting officers to determine what could be seized and what could not because constitutionally protected. Here, for example, there is no First Amendment problem identifying a gambling conversation as such; the difficulty is determining when the intrusion should terminate.

12. Again, the order in this case reflects the statutory purpose as it directed that the interception was not to terminate automatically when the type of communication was first obtained, "but shall continue until communications are intercepted which reveal the details of the commission of said offenses and which are sufficient to identify the participants in the commission of said offenses * * *."

13. The executing officers also have wide latitude in the use of seized conversa-

tions. When an officer engaged in an authorized interception intercepts communications relating to offenses other than those specified in the order of authorization, he may disclose the contents of those communications to other law enforcement officers if appropriate to the proper performance of official duties. Whether such dissemination is appropriate is a decision to be made by the executing officer, as no judicial approval is required. 18 U.S.C. § 2517.

14. It is also far different from the short series of precise intrusions on one end of a conversation involved in Katz which a judge " * * * could constitutionally have authorized, with appropriate safeguards * * *." Katz at 354, 88 S.Ct. at 513.

imposed by a judge. It accomplishes little to direct an officer to terminate his search when the authorized objective has been attained, since this is already required by the Constitution. *See, e. g.,* United States v. Highfill, 334 F.Supp. 700 (E.D.Ark.1971). The problem with Title III is that the authorized objective under it may be too broad, in violation of the particularity requirements of the Fourth Amendment. This constitutional defect is not cured by the fact that executing officers might follow a general direction to use self-restraint.

## C. Notice of the Search

A separate ground for holding that Title III violates the Constitution is our conclusion that it provides for unreasonable searches and seizures by not requiring prompt notice after authorized surveillance has been completed to those people whose conversations have been intercepted.

Katz recognized that once it is concluded that surveillance is constitutionally permissible, pre-search notice could not be constitutionally required without rendering the search completely useless. Having alerted the subject of the order, the evidence would be destroyed by never materializing. Katz, 389 U.S. at 355, 88 S.Ct. 507, 19 L.Ed.2d 576 (footnote 16); see Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Neither Katz nor any other wiretapping or eavesdropping case, including the cases holding Title III to be constitutional, has dealt with the question of whether there is any constitutional requirement for post-search notice.

In Ker, *supra,* the lack of announcement by officers before entry into a suspect's home was excused because of the possible destruction of evidence if the individual had been forewarned. While

there was no announcement to the occupants before entry into their home, they had immediate notice of an arrest and seizure of evidence taking place once the officers came into the home. Thus, Ker did not involve a search and seizure conducted entirely in secret, which is the situation which we are confronted with in Title III searches.

Secret searches have never been a part of our system of government. See Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); United States v. Gervato, 340 F.Supp. 454 (E.D.Pa., 1972). If the electronic interception of communications is to be constitutionally permissible, it must of necessity be conducted in secret as Katz points out, but the secret search is such an extraordinary procedure under the Fourth Amendment that basic decency and the prohibition against unreasonable searches and seizures embodied in that Amendment require that prompt and adequate notice after the search must be given to all those whose conversations have been overheard by the government.

Under Title III, persons not named in the order as the subject of the surveillance have no right whatsoever to be notified of the interception of their conversations,[15] unless the contents are to be "received in evidence or otherwise disclosed in any trial, hearing, or other proceeding." 18 U.S.C. § 2518(9); United States v. Iannelli, 339 F.Supp. 171 (W.D.Pa.1972). When the contents are to be used in a proceeding, the individual is entitled to ten days notice before such use is made, but if the government intercepts the communications and disseminates the contents among law enforcement agencies, 18 U.S.C. § 2517, without ever introducing them into a proceeding, no notice is required.[16]

15. A judge in his discretion may notify "such other parties to intercepted communications as [he] * * * may determine * * * is in the interest of justice * * *." 18 U.S.C. § 2518(8) (d).

16. Of course, without any notice, the individual could never seek civil redress against the executing officers if they vio-

lated the Fourth Amendment in the manner in which they conducted the search. *See* Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Also rendered a nullity is the protection afforded by 18 U.S.C. § 2520 which provides for civil remedies against any law enforcement officer who in bad faith discloses or uses the intercepted communications.

The subject of the order does have an absolute right of notice, but it need be neither prompt nor adequate. There is a provision requiring notice within ninety days after the termination of the interception, but this time limitation is somewhat less than firm. "On an ex parte showing of good cause to a judge of competent jurisdiction the serving of the inventory required by the subsection may be postponed." 18 U.S.C. § 2518(8) (d). The indefinite postponement of notice permitted by this section is explained in the following way in the legislative history.

> "For example, when interception is discontinued at one location, when the subject moves, but is reestablished at the subject's new location, or the investigation is still in progress, even though interception is terminated at any one place, the inventory due at the first location could be postponed until the investigation is complete."

> S.Rep. No. 1097, 90th Cong., 2d Sess., 1968, U.S.Code Cong. & Admin.News pp. 2112, 2194.

Secret searches by definition reach the outer limits of what is permissible under the Fourth Amendment, but then to delay notice to the subject of the search for a substantial period of time because it might hamper an investigation is in our view well beyond the bounds of the Constitution. If this procedure is sanctioned under this statute, it may not be long before we hear the same justification offered for allowing traditional searches to be executed in secret and kept secret if possible. Whenever a man's home is searched in his presence he is alerted that he is under investigation, and consequently future investigative efforts will be hampered, but it has never before been suggested that the government could conduct itself in this deceptive manner and comport with the requirements of the Fourth Amendment.

Besides a basic right to know whenever the government has invaded an area in which a person has a reasonable expectation of privacy, serious prejudice can result to the individual who is notified that a search has taken place months and perhaps years after the occurrence. When the memory of a speaker or listener has long since dimmed, it is difficult to see how an effective challenge can be made to the accuracy of a partially garbled recording or an assertion made that a conversation was taken out of context by the government.

When given, notice may be of little value beyond informing a person that his conversations have been listened to by the government. The Act fails to give the individual the right to an inventory of the contents of the intercepted communications. All that Title III requires is that the notification contain the date of the order, the period authorized for interception, and whether interceptions did in fact take place pursuant to the order.[17]

While the question of post-search notice is admittedly a novel question under the Fourth Amendment, considering a heritage which does not include secret searches, we find a violation because "[t]he Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted." Go–Bart Importing Company v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931).

For all of the foregoing reasons, we find Title III to be unconstitutional. If Berger and Katz were an invitation to Congress to write a wiretapping statute

17. Thus, even with the statutorily required notice to the person named in the order, the individual is virtually precluded from seeking civil remedies based on any improper conduct on the part of the executing officers. See footnote 16, *supra*.

"The judge, upon the filing of a motion, may in his discretion make available to such person or his counsel for inspection such portions of the intercepted communications * * * as the judge determines to be in the interest of justice." 18 U.S.C. § 2518(8) (d).

that could pass constitutional muster, we think that Congress unfortunately has exceeded the scope of that invitation. We recognize that Congress attempted to respond to what it considered to be the legitimate needs of those engaged in the fight against crime. However, we can only echo the words of Berger in justifying our conclusion.

" * * * [W]e cannot forgive the requirements of the Fourth Amendment in the name of law enforcement. This is no formality that we require today but a fundamental rule that has long been recognized as basic to the privacy of every home in America. While 'the requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement,' (citation omitted), it is not asking too much that officers be required to comply with the basic command of the Fourth Amendment before the innermost secrets of one's home or office are invaded. Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices."

Berger, 388 U.S. at 62–63, 87 S.Ct. at 1885.

The defendants' motions to suppress are granted.