UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley D. ANDERSON et al.,
Defendants-Appellants.

No. 75–2082.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1976.

Decided Sept. 30, 1976.

Rehearing and Rehearing En Banc Denied
Nov. 15, 1976.

Gerald M. Werksman, Chicago, Ill., for defendants-appellants.

William J. Mulligan, U. S. Atty., John A. Nelson, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CLARK, Associate Justice,[*] SPRECHER, Circuit Judge, and CAMPBELL, Senior District Judge.[**]

SPRECHER, Circuit Judge.

In this gambling case, the issues presented for review are whether the evidence derived from a wiretap should have been suppressed as to all defendants and whether the evidence was sufficient to convict defendants Thomas Gokey and Randy Crews.

I

Viewed in a light most favorable to the government, the undisputed facts tended to show that Stanley Anderson, defendant-appellant, owner of a sporting goods store in Lake Geneva, Wisconsin, enjoyed betting on sporting events but could not do so because his bookmaker moved to Florida. On February 7, 1975, he called Thomas Gokey, defendant-appellant, who lived in Woodstock, Illinois and asked if he could put him in touch with a bookmaker. Gokey recommended James Traub, defendant-appellant, a resident of Elgin, Illinois. Gokey then arranged and attended a meeting between Anderson and Traub on February 10, 1975 at Anderson's store. The next day, Anderson began betting with Traub. Randy Crews, defendant-appellant, a friend of Anderson, who shared his interest in betting on sporting events, lived in Lake Geneva, Wisconsin. Anderson kept Crews informed of his relationship with Traub and relayed Crews' bets to Traub.

On March 6, 1975, Anderson, Traub, Gokey and Crews were indicted on several counts relating to gambling and later convicted by a jury of conspiracy to violate 18 U.S.C. § 1084 and for violation of 18 U.S.C. § 1952. The jury also found Anderson, Crews and Traub guilty of some additional counts. All counts referred to aiding and abetting, 18 U.S.C. § 2. Defendants now appeal these convictions.

II

During the course of the investigation and prosecution of this case, the government made extensive use of information gathered by the use of wiretaps. Defendants contend that this evidence should have been suppressed. Specifically, defendants argue that the application for the wiretap and supporting affidavits therein failed to comply with the exhaustion requirements of 18 U.S.C. § 2518(1)(c) and that the same affidavits contained intentionally false material statements. We reject defendants' contention.

Title 18, U.S.C., Section 2518(1)(c) requires that:

(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

\* \* \* \* \* \*

(c) a full and complete statement as to whether or not other investigative

* Honorable Tom C. Clark, Associate Justice (Retired), United States Supreme Court, is sitting by designation.

** Honorable William J. Campbell, Senior District Judge, United States District Court for the Northern District of Illinois, is sitting by designation.

procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

■ We shall consider § 2518(1)(c) in light of the discussion in S.Rep.No.1097, 90th Cong., 2d Sess. 101 (1968); 1968 U.S. Code Cong. & Admin.News 2112, 2190:

Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are unlikely to succeed if tried, or to be too dangerous. This requirement is patterned after traditional search warrant practice and present English procedure in the issuance of warrants to wiretap by the Home Secretary. (Citation omitted.) The judgment would involve a consideration of all the facts and circumstances. Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants. Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. (Citations omitted.) *What the provision envisions is that the showing be tested in a practical and commonsense fashion.* (Emphasis added.)

Numerous courts have applied the test suggested by Congress that requiring the exhaustion of "normal investigative proce-

dures" must be reviewed in a "practical and commonsense fashion." *In re Dunn,* 507 F.2d 195, 197 (1st Cir. 1974); *United States v. James,* 161 U.S.App.D.C. 88, 494 F.2d 1007, 1015, *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495 (1974); *United States v. Steinberg,* 525 F.2d 1126 (2d Cir. 1975). The court in *United States v. Whitaker,* 343 F.Supp. 358, 362–63 (E.D.Pa.1972), considering this provision said:

It is immediately apparent that this provision does not even require that any other investigative procedure be tried first before an order is issued for the interception of wire communications. It is not required that a wiretap be used as a last resort, but only that the success of other methods of investigation appear unlikely.

*See United States v. Smith,* 519 F.2d 516, 518 (9th Cir. 1975).

Additionally, we recognize that "the government's burden of establishing its compliance with [subsection 2518(1)(c)] is not great," *United States v. Askins,* 351 F.Supp. 408, 414 (D.Md.1972), *United States v. Whitaker, supra* at 363. Thus, Judge Garth in *United States v. Armocida,* 515 F.2d 29, 38 (3d Cir. 1975), concluded:

To support a finding that normal investigative procedures are unlikely to be successful, we interpret the congressional directions as only requiring that there exist a factual predicate in the affidavit.

■ With these principles in mind, we now turn to the application and supporting affidavit upon which the wiretap was granted.[1] The affidavit submitted by FBI Agent Speidell stated that his investigative

1. Agent Speidell's affidavit provided, in pertinent part that:

6. From my eight and one-half years of investigative experience, including four years investigating gambling offenses, and the experience of other Agents who related to me I know that:

A. Certain large bookmakers require the service of knowledgeable sports handicappers who provide the latest pertinent wagering information, referred to as odds, wire service, or line information. The number of persons formulating odds information is necessarily limited to the required skill and

therefore persons disseminating the odds and line information are normally contacted by telephone by bookmakers seeking the most recent information available.

7. The very basis for success for a large scale bookmaker is the ability to immediately make large layoffs and insurance bets with other gambling operations. This is referred to as a "move" or "out" and provides a bookmaker with the means of exercising certain necessary alternate actions he must take on a specific event. He may book the entire wager or some portion of it himself or "move" it to another operation and in some

experiences, as well as other agents' investigative experiences, indicated that normal investigative procedures would be ineffective. The affidavit showed that: (1) the informants known to the FBI would not "testify in any legal proceeding to the information they have furnished, for to do so would place their lives and the lives of their families in jeopardy"; (2) that the nature of a bookmaking operation requires an unavoidable dependence on telephone facilities; (3) toll records could not be relied on to show the contents of calls nor the parties thereto; (4) identification of places called by Anderson did not reveal identity of the recipient or the nature of the call; (5) Anderson's notations of bets were not understandable; and (6) Anderson's co-employee at the Sports Shop could only provide his interpretation of Anderson's gambling activities.

In sum, the affidavit informed the issuing judge of how far the investigation had proceeded and that the only reasonable way to develop necessary evidence of a federal violation was to intercept communications from Anderson's telephone. This information sufficiently complied with the exhaustion requirement of § 2518(1)(c). The affidavit clearly established that other investigative techniques which had been utilized (informer's reports, interviews with individuals, surveillance, toll records and their fol-

low-up) failed to produce sufficient evidence of gambling offenses.[2]

Finally, we agree with the court in *United States v. Bobo,* 477 F.2d 974, 982 (4th Cir. 1973), which noted that:

If the Crime Control Act could be validly utilized in any investigation, it would seem to be one involving gambling operations using telephone facilities almost exclusively as a means for communications.

■ Defendants also challenge the affidavit contending that it contained intentionally false allegations. Paragraph 16 of Agent Speidell's affidavit (see footnote 1) alleged that the two informants would not testify under any circumstances for fear of placing their lives and the lives of their families in jeopardy. However, at the defendants' request source number two— Thomas P. Nelson—a police lieutenant in Lake Geneva, testified at trial and made statements which seemed to directly conflict with the affidavit. When questioned on direct examination about his conversation with Agent Speidell in regard to testifying at trial, Mr. Nelson stated:

Q. [By Mr. Werksman] Now, did you ever discuss with Agent Speidell testifying against Stanley Anderson?

A. [Mr. Nelson] Yes.

Q. Did you ever tell Agent Speidell that you would not under any circumstances testify in any legal proceeding

instances even add an accompanying wager of his own. Without the possibility of an "out" a bookmaker would be forced to handle only wagers he was capable of paying off. Considering the heavy wagering interest experienced in particular sporting events, a bookmaker would be forced to limit his "handle" or gross wagers to a small percentage of what he might otherwise handle without access to "outs".

Furthermore, it is characteristic of bettors that they will place their wagers at the latest possible moment in order to obtain the best possible odds and the most current information. This, in turn, requires an immediate relay of many wagers through the bookmaking structure in a short period of time so that all books can be balanced before the event. Such an exchange of information necessarily requires an unavoidable dependence by the bookmakers on the telephone facilities. * *

16. Source number one and source number two above have both stated they will not, under any circumstances, testify in any legal proceeding to the information they have furnished, for to do so would place their lives and the lives of their families in jeopardy.

17. For the reasons set out, hereinafter all normal avenues of investigation and prosecution are closed, and it is submitted that the only reasonable way to develop necessary evidence of violation of Federal statutes by those persons named herein, is to intercept wire communications from the telephone specified above.

2. Other courts have held similar affidavits to be sufficient: *United States v. Bobo,* 477 F.2d 974 (4th Cir. 1973); *United States v. Askins,* 351 F.Supp. 408, 414 (D.Md.1972); *United States v. Whitaker,* 343 F.Supp. 358, 363 (E.D.Pa.1972); *United States v. Kerrigan,* 514 F.2d 35 (9th Cir. 1975).

regarding Stanley Anderson because to do so would place your life and the life of your family in jeopardy?

A. I don't know if those particular words were used; but, yes, I did, and I did not want to testify.

Q. Did you tell Agent Speidell that you were afraid of Stanley Anderson?

A. No, I was—no.

Q. Did you tell Agent Speidell that you feared for your life or the lives of your children and wife if you testified against Stanley Anderson?

A. No.

        \*       \*       \*       \*

Q. Did you tell Agent Speidell that if you were subpoenaed you would do so?

A. Yes.

Q. All right.

Mr. Werksman: May I have just a moment, Judge?

(Pause)

Q. Now, when you told Agent Speidell it might be what I characterize as uncomfortable to testify against Mr. Anderson, that was because you were his dear and personal friend; isn't that right?

A. Yes.

Q. And had nothing to do with fear of your life, did it?

A. No.

Q. As a matter of fact, you still are a friend of Mr. Anderson's aren't you?

A. I would hope so.

Q. And that friendship runs so deep that on the evening that Mr. Anderson was arrested in this very case you sat in his living room and comforted his wife till 5:00 a. m. in the morning, isn't that right?

A. That's correct.

Tr. 494–96. During cross-examination, Mr. Nelson's testimony remained unchanged. However, when Judge Gordon questioned him the following transpired.

By the Court:

Q. Mr. Speidell has advised the Court that you claimed that you would not under any circumstances testify in any legal proceedings to the information that you furnished. Is that statement correct?

A. That statement is correct, Your Honor.

Q. He also stated that you would not do so because it would place your life and the lives of your family in jeopardy. Is that statement correct?

A. I don't know if those exact words were used, but, yes, yes to that. I don't know if those exact words were used, Your Honor. I cannot recall.

Tr. 506.

In order to warrant suppression of the evidence derived from a wiretap, it must be shown that an affidavit in support thereof was recklessly or intentionally untrue. This standard was announced by the Seventh Circuit in *United States v. Carmichael*, 489 F.2d 983, 988–89 (7th Cir. 1973) (*en banc*), when Judge Cummings, writing for the court, held:

Evidence should not be suppressed unless the trial court finds that the government agent was either recklessly or intentionally untruthful. A completely innocent misrepresentation is not sufficient for two reasons. Most importantly, the primary justification for the exclusionary rule is to deter police misconduct. . . . and good faith errors cannot be deterred.

        \*       \*       \*       \*

The rule we announce today is intended only to test the credibility of government agents whose affidavits or testimony are before the magistrate.

After carefully reviewing Mr. Nelson's testimony in the instant case, we agree with the district court's ruling that the allegations of Agent Speidell were "at least sufficiently correct so the Court would not apply the sanction of the *Carmichael* case and penalize the Government for a willing, knowing falsity." (Tr. 514.) Inasmuch as Mr. Nelson attributed those statements as being his, Agent Speidell's affidavit cannot be considered an intentional or reckless misrepresentation.

### III

Defendants next contend that the evidence was insufficient to convict Thomas Gokey of conspiracy to violate 18 U.S.C.

§§ 371, 1084, or violation of the Interstate Travel Act in aid of racketeering, 18 U.S.C. § 1952. In regard to the conspiracy conviction, defendants claim that Gokey merely introduced two persons to each other knowing they had compatible needs and that he had no voice or interest in the Anderson-Traub relationship.

To resolve this question we must determine:

. . . whether all the evidence when viewed in the light most favorable to the Government and considering the jury's right to weigh the evidence, determine credibility, and draw justifiable inferences, could fairly support a verdict of guilt beyond a reasonable doubt.

*United States v. Cardi,* 478 F.2d 1362, 1368 (7th Cir.), *cert. denied,* 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973); *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Scher,* 476 F.2d 319 (7th Cir. 1973).

The facts advanced at trial are not disputed. The evidence reveals that: (1) on February 7, 1975, Gokey and Anderson had a conversation concerning Anderson's need of a new bookmaker; (2) during this conversation, Gokey recommended Traub and promised to arrange for Anderson to talk with him; (3) Anderson received a call from Gokey on February 8, 1975, in which Gokey asked whether he would be available to meet with Traub on February 10, 1975; (4) on February 10, 1975, Gokey, Traub and Anderson met in Anderson's store; (5) Anderson began betting with Traub the next day; and (6) also on that same day he called Gokey to discuss the meeting of the previous night. During that conversation, Gokey stated that the arrangement between Anderson and Traub would be good for them both since Traub had the connections and Anderson had the bankroll. He also said that Traub had offered him a piece of the action, but that "he never play[s] another man's game." Gokey further stated that "maybe someday he can do me a favor." The following day, Gokey called Anderson to see how things had gone the first day of the Anderson-Traub relationship. In sum,

it is clear that Gokey knew what the introduction and meeting of Anderson and Traub was intended to produce—a gambling relationship between Traub in Elgin, Illinois and Anderson in Lake Geneva, Wisconsin.

■ With these facts in mind we briefly review the law of conspiracy. Section 371 of Title 18 of the United States Code provides in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"The gist of the crime of conspiracy is an agreement to commit unlawful acts." *United States v. Noah,* 475 F.2d 688, 693 (9th Cir. 1973). *See United States v. Greer,* 467 F.2d 1064, 1071 (7th Cir. 1972). No formal agreement is necessary to establish a conspiracy. *United States v. Amato,* 495 F.2d 545, 549 (5th Cir. 1974); *United States v. Varelli,* 407 F.2d 735, 741 (7th Cir. 1969). In fact, as the court pointed out in *Varelli, supra* at 741:

[F]ormalities . . . are usually lacking since the mark of a successful conspiracy is secrecy.

As a general matter, in conspiracy charges:

. . . the evidence must show that the accused intended to join and cooperate in the illegal venture. Knowledge that a conspiracy exists is a minimum requirement for establishing the requisite intent. 'Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal.' . . .

*United States v. Amato, supra* at 550. (Citation omitted.) "A single act may be foundation for drawing the actor within the ambit of a conspiracy. . . . But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent."

*United States v. Varelli, supra* at 743. (Citation omitted.) In addition to an agreement of two or more persons to combine their efforts to achieve an illegal purpose, "an overt act by one person in furtherance of the agreement" is necessary. *United States v. Reynolds,* 511 F.2d 603, 607 (5th Cir. 1975). It is well settled that these elements can be proven by direct as well as circumstantial evidence. *United States v. Reynolds, supra* at 607.

■ Applying these standards and considering all the evidence, we feel that the jury could reasonably infer from the evidence that the defendant Gokey was a member of the alleged conspiracy as his actions precipitated the entire activity.

■ Defendants further contend that the evidence failed to support Gokey's conviction with respect to the Travel Act, 18 U.S.C. § 1952. Section 1952 provides in pertinent part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

Again, it is clear that the sole purpose of Gokey's travel from Illinois to Lake Geneva, Wisconsin on February 10, 1975, was to introduce Traub to Anderson for the purpose of establishing or promoting an unlawful activity—interstate transmission of wagering information. Thus, we conclude that the jury's verdict was supported by the evidence.

## IV

We next consider whether there was sufficient evidence presented at trial to convict Randy Crews of one count of conspiracy, 18 U.S.C. § 371, one count of the Travel Act, 18 U.S.C. § 1952, and four counts of Interstate Transmission of Wagering Information, 18 U.S.C. § 1084.

■ The evidence at trial showed that Anderson contacted Crews on February 7 to tell him that through Tom Gokey they might be able to get a new bookmaker and Crews was pleased. On February 10, Anderson told Crews that the meeting was set for that evening with Traub. Later that evening he called Crews and told him about the meeting and arrangements. Again, Crews was pleased. On February 11, Crews called Cy Youman concerning a check bounced by Anderson which was endorsed to Nutsy, Anderson's former bookmaker. After the Anderson-Traub arrangement began, Crews spoke with Anderson at least once a day. Their conversations involved in depth discussions of the merits of betting one side of a particular game or the other and the comparison of line information.[3] Crews placed substantial bets with Anderson when these discussions ended. Also, Crews had on occasion used Anderson's phone to collect line information. When asked to characterize the Anderson-Crews relationship, the expert witness, Phillip Harker stated it was "in the nature of a partnership, a cooperating relationship where they were valuing one another's opinions and more or less working together." (Tr. 533.) The government suggests

---

**3.** A "line" is theoretically a handicap which is a number of points that are either added to the underdog score or subtracted from the favorite score.

that this was sufficient evidence to show that Crews was Anderson's partner or alternatively as "an aider and abettor," transmitted wagers or bets interstate; traveled interstate to facilitate or promote the gambling activity and conspired with Anderson to transmit wagering information interstate. We disagree.

First, 18 U.S.C. § 1084(a) requires that a defendant be "engaged in the business of betting or wagering" to be in violation of the statute.[4] *See* U.S.Code Cong. & Admin.News, pp. 2631–32 (1961); *Sagansky v. United States,* 358 F.2d 195, 201 (1st Cir. 1966). In *United States v. Tomeo,* 459 F.2d 445, 447 (10th Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 232, 34 L.Ed.2d 175 (1972), the court explained:

> The statute [18 U.S.C. § 1084] deals with bookmakers—persons 'engaged in the business of betting or wagering.' Bookies *take* bets, they receive them, they handle them; it is a transaction requiring mutuality or a meeting of minds. (Emphasis in the original.) ·

*United States v. Sellers,* 483 F.2d 37, 45 (5th Cir. 1973). In *Sagansky, supra* at 200, the First Circuit stated:

> . . . [Sec.] 1084(a) does not punish the mere transmission of bets or wagers, but rather the 'use' of interstate wire communication facilities for their transmission. When a person holds himself out as being willing to make bets or wagers over interstate telephone facilities, and does in fact *accept offers of bets or wagers* over the telephone *as part of his business,* we think it is consistent with both the language and the purpose of the statute to hold that he has 'used' the facility for the transmission of bets or wagers. (Emphasis added.)

In the instant case, there was no evidence that Crews was in the "business of betting or wagering." Furthermore, the evidence

was insufficient to show that he was an aider and abettor. Title 18 U.S.C. § 2 provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The record merely reflects that Crews was a friend of Anderson who regularly placed bets with him. Moreover, we are convinced that the conspiracy conviction cannot stand. There was no evidence that Crews intended to join the conspiracy or committed any acts in furtherance thereof. The fact that Crews wished the Anderson-Traub venture to succeed so that he could place bets with Anderson was not enough to make him a conspirator. Finally, we must reverse Crews' conviction for violating the Travel Act, 18 U.S.C. § 1952. There was no evidence that Crews, as principal or aider and abettor, met with or transported Traub over the Illinois-Wisconsin border for the February 10, 1975 meeting with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

Accordingly, we affirm the convictions of Defendants Traub, Gokey and Anderson, and reverse the conviction of Defendant Crews on all counts.

AFFIRMED IN PART; REVERSED IN PART.

WILLIAM J. CAMPBELL, Senior District Judge (dissenting).

In support of the application for a wire tap authorization, Agent Speidell filed a

---

4. Section 1084 provides, in pertinent part:

(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitled the recipient to receive money or credit as a result of bet or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

lengthy affidavit wherein he asserted that his "sources", one of whom was later identified as Police Lieutenant Thomas P. Nelson, "have both stated they will not, under any circumstances, testify in any legal proceeding to the information they have furnished, for to do so would place their lives and the lives of their family in jeopardy." In my view, it is wholly unrealistic to characterize this statement as anything less than a knowing and intentional falsehood. Officer Nelson, in fact, testified that he was not afraid of Stanley Anderson, and had not told Agent Speidell that he feared for his life or the lives of his wife and children. In substance, the testimony of Officer Nelson showed that he was reluctant to testify—that he would have preferred not to testify—because of his personal association with Anderson, who apparently at one time had been his next door neighbor. He no doubt expressed this desire to Agent Speidell in no uncertain terms. But since Agent Speidell knew that Nelson was a police officer, he must have known that, if subpoenaed, Nelson of course would testify. And there was absolutely no basis for the assertion that Nelson feared for his life and the lives of his family. The statement was false and I cannot conceive that Agent Speidell did not know it was false. Under *United States v. Carmichael,* 489 F.2d 983, 988 (7th Cir.1973), the evidence should have been suppressed.

I am also of the view that the conviction of appellant Gokey for conspiracy should have been reversed. Although he introduced Anderson to Traub and knew the purpose of their prospective association with one another, he did not participate in the venture and had no stake in its outcome. In fact, he declined an invitation to participate. The record is bereft of any indication that appellant Gokey entered into an agreement to engage in activities proscribed by 18 U.S.C. § 1084.