UNITED STATES of America

v.

Joseph E. CAFERO a/k/a Ernie,
Appellant in No. 72–1577, et al.

Appeal of Dominick VINCIGUERRA,
a/k/a Dom, in No. 72–1578.

Nos. 72–1577, 72–1578.

United States Court of Appeals,
Third Circuit.

Argued Nov. 28, 1972.

Decided Jan. 30, 1973.

Peter A. Galante, Philadelphia, Pa., for appellants.

Carl J. Melone, U. S. Atty., Philadelphia, Pa., Sidney M. Glazer, John J. Robinson, Dept. of Justice, Appellate Section, Crim. Div., Washington, D. C., for appellee.

Before McLAUGHLIN, ALDISERT and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

Appellants were tried in the district court on multi-count indictments charging conspiracy and use of interstate facilities in aid of an illegal gambling enterprise in violation of 18 U.S.C. § 1952. Cafero was found guilty on both counts; Vinciguerra, on the conspiracy count. The questions presented for review in

these appeals are: whether Title III, Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20, offends the Fourth Amendment and is therefore unconstitutional; whether, assuming constitutionality, there was compliance with the statutory requirements of Title III; whether the indictment was sufficient; and, whether the trial court improperly admitted certain evidence.

The government's proof demonstrated that Cafero was a principal in an illegal numbers lottery operating in Philadelphia. Bets were placed on a daily three-digit number which was computed from the parimutuel results of specified races at Florida race tracks. The results of these races were telephoned to Cafero. This transmittal was made within a half-hour after the completion of each race. The origin of the calls to Cafero was not placed into evidence, but because of the time factor between the end of the race and the communication of the results, the government relied on the permissible inference that the calls originated in Florida and terminated in Pennsylvania.[1] After receiving the telephonic information, Cafero would call Vinciguerra and others, informing them of the winning digits. Evidence of this operation was received from a government telephone tap placed on Cafero's telephone following court authorization under Title III.

Application for the court-ordered telephonic interception was made by the FBI and supported by affidavits of two informers, one of whom had been providing information to the FBI "for a period exceeding four years, such information resulting in two Federal convictions in the gambling field and 20 local gambling arrests." It was averred that the second informant had consistently provided Philadelphia police with trustworthy information, and that both informants obtained their information from personal observations and from Cafero himself.[2] The court order authorized interception for fifteen days subject to earlier termination if the objectives were attained. The wiretap began on January 17, 1970, and terminated seven days later on January 24, 1970. Within ninety days of this termination, the government requested a postponement of the filing of the inventory required by 18 U.S.C. § 2518(8)(d). On April 21, 1970, a court order authorized such a postponement for thirty days. The inventory was filed on May 12, 1970, within the authorized postponement period.[3] At trial, appellants made appropriate motions to suppress the evidence on grounds properly noticed in these appeals.

Before this court, appellants have the advantage of the thoughtful opinion of Chief Judge Joseph S. Lord, III, in United States v. Whitaker, 343 F.Supp. 358 (E.D.Pa.1972), in which Title III was held unconstitutional. Appellants rely heavily upon this opinion in mounting their constitutional attack. Bound by pronouncements of the Supreme Court, the *Whitaker* court accepted as bedrock the principles enunciated in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); and Katz v. United States, 389 U.S. 347, 88

---

1. Florida law prohibits the dissemination of race results less than one-half hour after the completion of each race except for the feature race. 16 Fla.Stat.Anno. 550.35 (1)(2).

2. We find that the issuing judge made proper findings of probable cause, 18 U.S.C. § 2518(3), meeting the requirements of Aquilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410,

89 S.Ct. 584, 21 L.Ed.2d 637 (1969); and United States v. Singleton, 439 F.2d 381, 383–385 (3d Cir. 1971).

3. Upon review of the record we find that the issuing judge did not abuse his discretion in finding good cause for the extension of time. Because the inventory was in fact filed, the doctrine of United States v. Eastman, 465 F.2d 1057 (3d Cir. 1972), is not applicable. See, pp. 500–501, *infra.*

S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, *Whitaker* does not accept *in ipsis verbis* the theory that there may never be constitutionally permissible eavesdropping.[4] Rather, *Whitaker* holds that the statutory procedures of Title III do not comport with the rigid requirements for constitutionally permissible court-supervised interceptions as formulated by the Supreme Court.

This formulation was perhaps best expressed by Justice Stewart in *Katz, supra,* 389 U.S. at 355, 88 S.Ct. at 513:

> [U]nder sufficiently "precise and discriminate circumstances," a federal court may empower government agents to employ a concealed electronic device "for the narrow and particularzied purpose of ascertaining the truth of the . . . allegations" of a "detailed factual affidavit alleging the commission of a specific criminal offense." Osborn v. United States, 385 U.S. 323, 329–330, 87 S.Ct. 429.

Although dissenting in Lopez v. United States, *supra,* Justice Brennan acknowledged that lawful electronic surveillance was possible: "The requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement. It is at least clear that 'the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment,' . . . could be made a pre-condition of lawful electronic surveillance." 373 U.S. at 464, 83 S.Ct. at 1401.

■ Thus, prior to embarking upon an analysis of appellants' *Whitaker*-based argument, we reject their contention that the Fourth and Fifth Amendments preclude *any* electronic surveillance. Their suggestion that such a conclusion is commanded by Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524,

29 L.Ed. 746 (1886), which reviewed the celebrated English case of Entick v. Carrington and Three Other King's Messengers, 19 Howell's State Trials 1029 (1765), was rejected in *Berger, supra,* 388 U.S. at 49–53, 87 S.Ct. 1873.

## II.

*Whitaker* found Title III constitutionally deficient in three respects:

1. Section 2518(5), which permits interception for up to a thirty-day period, and allows for court-authorized extensions, was found to present "the constitutional objection to lengthy continuous surveillance expressed in Berger. Title III's intrusion is not 'precise' nor 'carefully circumscribed' nor 'very limited.' The fact that it permits 30-day continuous searches which are only half as long as those condemned in Berger is a distinction without constitutional significance. This aspect of Title III alone renders the Act unconstitutional." 343 F.Supp. at 365–366.

2. Title III was found to lack specific guidelines restricting the executing officer's discretion. "It is left to the executing officers to determine when they have learned enough details concerning enough people about the offense in question so that they should and must stop their interception because the authorized objective has been attained. . . . While Title III is a significant improvement from the New York statute found unconstitutional in Berger, it still lodges too much discretion in the executing officers to comply with the Constitution." 343 F.Supp. at 367.

3. Finally, *Whitaker* found that Title III "provides for unreasonable searches and seizures by not requiring prompt notice after authorized surveillance has been completed to those people whose conversations have been intercepted." 343 F.Supp. at 368.

---

4. Professor Ralph S. Spritzer is an articulate advocate of this theory: "Electronic Surveillance by Leave of the Magistrate: The Case in Opposition," 118 U.Pa.L.Rev. 169 (1969). The article adopts the major premise of Justice Douglas' dissent in Osborn v. United States, *supra,* 385

U.S. at 352, 87 S.Ct. at 445, 17 L.Ed.2d 394: "I would adhere to *Gouled* [v. United States, 255 U.S. 298, 41 S.Ct. 261, 66 L.Ed. 647 (1921)] and bar the use of all testimonial evidence obtained by wiretapping or by an electronic device."

## 1.

Initially, we do not agree with the *Whitaker* court's observation that "Title III's intrusion is not 'precise' nor 'carefully circumscribed' nor 'very limited.'" 343 F.Supp. at 365. Section 2518(1)(b) provides that the application must contain "a full and complete statement of the facts and circumstances . . . of the type of communications sought to be intercepted." The application must contain details of the particular offense, and "a particular description of the nature and location of the facilities" where the interception is to be made. 18 U.S.C. § 2518(1)(b). Moreover, after considering the application, the judge may issue an intercept authorization only after making the specific findings required by section 2518(3), including the existence of probable cause, and must include in the authorization:

(a) the identity of the person, if known, whose communications are to be intercepted;

(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

18 U.S.C. § 2518(4).

Confronted with the argument that the intrusion authorized by Title III is not sufficiently "precise," "circumscribed" or "limited," the Tenth Circuit responded succinctly and, in our view, properly: "As we view it, Congress was seeking to deal realistically with highly complex problems in accordance with the demands of the Constitution. We are unable to say that the product fails to satisfy the Constitution. Every effort has been made to comply with the requirements of *Berger* and *Katz*. Section 2518(4) of Title III is as precise and discriminate in its approach as are the demands of *Berger* and *Katz*." United States v. Cox, 449 F.2d 679, 687 (10th Cir. 1971), cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972).

Implicit in Judge Lord's rejection of the thirty-day maximum requirement of section 2518(5) is an unspoken premise that a shorter time might have passed constitutional muster. A good case can be presented, however, that a fifteen-day period would also not have been sufficiently restrictive in his view, for the order in *Whitaker* was for a fifteen-day search with reports on the fifth and tenth days. 343 F.Supp. at 366, n. 10. This day-counting approach to constitutional acceptability, however, misses the mark because it overlooks what we perceive to be the clear Congressional intent that: (1) the length of interception in each case be determined by judicial decision on a case-by-case basis;[5] (2) the interception be terminated automatically, not necessarily on a predetermined calendar date, but when the objective of the authorization is achieved, 18 U.S.C. § 2518(5); and (3) while there is a maximum statutory life span of thirty days for each approval order, each interception has the very real potential of earlier extinction, 18 U.S.C. § 2518(6).

The thirty-day period contemplated by Title III is a statutory *maximum*, not an automatic authorization for continuous interceptions for thirty days. *Whitaker* construed 18 U.S.C. § 2518(4)(e) as making automatic termination discretionary with the issuing

---

5. "A wiretap can take up to several days or longer to install. Other forms or devices may take even longer. The provision [§ 2518(5)] is intended to recognize that each case must rest on its own facts." Senate Report, 1968 U.S.Code Cong. and Admin.News, at p. 2192.

judge, thus permitting continued interception without a showing of probable cause after the first sought communication has been obtained. In this respect, Judge Lord observed:

> If a judge exercised certain discretionary powers which the Act gives him, the order may not violate the Fourth Amendment. The difficulty, though, is precisely that those powers are discretionary and not mandated. It follows that the Act does not command a constitutional order; it permits an unconstitutional one.

343 F.Supp. at 363.

We do not agree with this interpretation of the Act. Section 2518(4)(e) must be interpreted in light of section 2518(5) which provides:

> No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. . . . Every order and extension thereof shall contain a provision that the authorization to intercept . . . must terminate upon attainment of the authorized objective, or in any event in thirty days.

■■ We do not read this section as providing for automatic termination upon attainment of the objective of the authorization only if a statement to this effect is included in the authorization pursuant to section 2518(4)(e) and, in the absence of such a statement, as permitting continuous surveillance for a period of up to thirty days. Rather, we interpret section 2518(5) as requiring automatic termination upon attainment of the objective of the authorization irrespective of whether a statement to this effect has been included by the authorizing judge. Thus, the thirty-day period provided in the statute does not represent the statutory life of all authorizations not containing a statement requiring termination upon attainment of the objective. Instead, the thirty-day

period is merely a statutory limitation on the life of any authorization, which terminates every authorization at the end of thirty days regardless of whether the objective of the authorization has been achieved. We find support for this position in the language of section 2518(1)(d) which requires that where automatic termination is not desired upon obtaining the described communication, the application must specifically set forth facts establishing probable cause to believe that additional communications of the same type will be received. We conclude, therefore, that section 2518(4)(e) must be construed as requiring automatic termination upon interception of the first sought communication or the achievement of the interception's objective unless the judge finds probable cause to justify continued surveillance.

Thus, the offensive autocracy of the calendar condemned in *Berger* has been supplanted by judicial authority in the first instance, by the right of *sua sponte* judicial review at any time, and by the expiration of statutory authority to continue the interception once the objective has been achieved. Carte blanche is given no one. Executing officers are not free to intercept beyond attainment of their objective for an hour, a day, seven days, or twenty-nine days. They are allotted time to achieve an objective, period. Should they intercept beyond this time, they have violated the Act.

■ We find nothing in this statutory schema to offend the standards previously expressed by the Supreme Court regarding the temporal aspects of the authorization. Accordingly, we reject the *Whitaker* rationale and align this court squarely with the other circuits which have addressed this issue. In United States v. Cox, 462 F.2d 1293, 1303 (8th Cir. 1972), the court said:

> We do not, however, read *Osborn*, *Katz* and *Berger* as holding that only "rifle shot" eavesdrops are constitutionally permissible. . . .
>
> Obviously an electronic search extending over a period of time will en-

compass overhearing irrelevant conversations, but the search of a building will likewise involve seeing and hearing irrelevant objects and conversations. [See *Berger, supra,* 388 U.S. at 108, 87 S.Ct. 1873, 18 L.Ed.2d 1040] We therefore reject the assertion that only single-conversation interceptions are constitutionally permissible, and we agree with the Tenth Circuit [United States v. Cox, *supra,* 449 F.2d 679] that *Berger, Katz* and *Osborn* do not indicate the contrary. We read those opinions as saying that "adequate judicial supervision or protective procedures" [*Berger, supra,* 388 U.S. at 60, 87 S.Ct. 1873, 18 L.Ed.2d 1040] such as are required by this Act provide the reasonableness which the Fourth Amendment requires.

■ Conceding that Title III as construed by this court requires mandatory termination and therefore minimizes interceptions, appellants nevertheless urge that the mandatory termination aspects of the Act are illusory.[6] It is claimed that once probable cause exists to justify the initial interception, the actual interception of a described communication will *a fortiori* establish probable cause for continued surveillance. This argument prompts numerous observations. First, it ignores the statutory requirement that continued interceptions require a new showing of probable cause, 18 U.S.C. § 2518(1), (3), (5), and any such additional surveillance is subject to effective judicial supervision. That is, the statutory schema requires the judicial officer to be aware of the on-going nature of the surveillance; in his discretion, he may order periodic reports or interpose any other appropriate safeguards. 18 U.S.C. § 2518(6). More important, the demonstration of probable cause for continued surveillance and the application for such surveillance are also subject to section 2518(3)(c), which requires that the authorizing judge find

that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." We are not so naive as to assume that the possibility of abuse does not inhere. "Bootstrapping," the phenomenon of one interception begetting another in the guise of probable cause, may occur. However, this possibility does not render Title III facially unconstitutional. Rather, alleged departures from the strictures of the statute are best dealt with on a case-by-case basis.

2.

■ The *Whitaker* court found "too much discretion in the executing officers to comply with the Constitution." 343 F.Supp. at 367. This conclusion is closely related to that court's prior conclusion that Title III permits continuous extended interceptions of the type held unconstitutional in *Berger.* However, "[t]he dragnet nature of the New York law [in *Berger*] resulted not only from the duration of the warrant, but also from the failure to confine the investigator's latitude with . . . various safeguards. . . ." United States v. Cox, *supra,* 462 F.2d at 1303. Thus, it appears that this conclusion was prompted by the *Whitaker* court's interpretation of section 2518(4)(e) as subjecting automatic termination to the authorizing judge's discretion under section 2518(5), rather than making it mandatory. As heretofore discussed, we have concluded otherwise. Title III allows the executing officer considerably less discretion than the New York statute in *Berger.* No longer can the officer continue surveillance without effective judicial supervision. If surveillance is improperly continued after the authorization has terminated, such surveillance is unlawful and subject to suppression. 18 U.S.C. § 2518(10)(a).

■ Moreover, a comparison is invited to the judicial supervision involved

---

6. See Schwartz, "The Legitimation of Electronic Eavesdropping: The Politics of 'Law and Order.'" 67 Mich.L.Rev. 455 (1969).

in typical searches for tangible objects, where the possibility exists that the executing officer may search beyond the scope of his warrant. The traditional means of curbing such conduct has been indirect judicial supervision through suppression of unlawfully seized evidence. This marks a critical difference between the condemned New York law and Title III. By terminating interception upon attainment of the objective, Title III has made it possible for courts to exclude evidence obtained through continuation of the interception after the authorization has terminated. Under Title III, the time at which the authorization terminated is an ascertainable fact. Such a determination could not be made under the New York law which contained no automatic termination provision. Thus, under Title III suppression provides a realistic remedy —unavailable in *Berger*—for abuse of discretion by the executing officer.

*Whitaker* refers to an alleged inability to describe with particularity the nature of the information to be intercepted. Because the court concluded that "more specific guidelines" must be given the executing officers, too much discretion is vested in the officers, and therefore, the Act is unconstitutional. However, *Whitaker* never indicates what these guidelines should be, and intimates that it is impossible to fashion them. 343 F.Supp. at 366. Thus postured, this argument is but a paraphrase of the thesis that the very nature of the search for oral communication by the use of electronic devices is flatly proscribed by the Constitution. See Justice Douglas' dissent from the denial of certiorari, Cox v. United States, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972). This approach was explicitly rejected by *Osborn, Berger* and *Katz*.

Moreover, Title III contains a noteworthy emphasis on particularities. "[A] particular description of the type of communication sought to be intercepted" is required. 18 U.S.C. § 2518(1)(b)(iii), and (4)(c). The application must contain a full and complete statement of facts, including details of the particular offense, and a particular description of the nature and location of the facilities where the interception is to be made. 18 U.S.C. § 2518(1)(b). The judge may even require the applicant to furnish additional evidence. 18 U.S.C. § 2518(2). The judge must make specific findings of fact prior to authorizing interception of a communication. 18 U.S.C. § 2518(3). Additionally, provision is made for relief in the event that "the order of authorization . . . is insufficient on its face," "the interception was not made in conformity with the order of authorization," or for any other reason "the communication was unlawfully intercepted." 18 U.S.C. § 2518 (10)(a). We reject, therefore, the contention that Title III vests too much discretion in the executing officer because of an unavoidable lack of precision in describing the proposed object of the interception. Suppression remains the appropriate remedy when imprecisions in an application or a warrant attain constitutional dimension, or when execution of the warrant is improper.

### 3.

Finally, the *Whitaker* court found Title III deficient "by not requiring prompt notice after authorized surveillance has been completed to those people whose conversations have been intercepted." 343 F.Supp. at 368. "While the question of post-search notice is admittedly a novel question under the Fourth Amendment, considering a heritage which does not include secret searches, we find a violation because '[t]he Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted.' Go-Bart Importing Company v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931)." 343 F.Supp. at 369.

For support of this novel proposition, the court did not rely on *Berger* or its progeny. Instead, it reasoned: "Secret searches by definition reach the outer

limits of what is permissible under the Fourth Amendment, but then to delay notice to the subject of the search for a substantial period of time because it might hamper an investigation is in our view well beyond the bounds of the Constitution." 343 F.Supp. at 369.

There is superficial appeal to this contention, especially the dangers of extending this concept to the area of traditional searches, and the observation that while Title III requires a notice to the person named in the order, 18 U.S.C. § 2518(8)(d), it does not guarantee disclosure to him of the inventory, nor does it provide mandatory notice to persons not named in the order, although the issuing judge may so direct. But the "secret search" argument is quite another thing. Indeed, the Supreme Court has already ruled that a secret electronic surveillance may comport with the Fourth Amendment. *Lopez, Osborn, Berger* and *Katz, supra.*

 We find it difficult to accept the proposition that a search may be deemed reasonable, and therefore constitutional during the various stages of application for authorization, execution, supervision of the interception, and termination, only to be invalidated *ab initio* because of the operation of some condition subsequent, to-wit, a failure to give notice of the items seized. In the context of traditional search warrants, a failure to comply with certain procedural requirements of F.R.Cr.P. 41 has been held not to amount to deprivation of Fourth Amendment rights necessitating suppression. Thus, failure to deliver a copy of the warrant to the party whose premises were searched until the day after the search does not render the search "unreasonable" in terms of the Fourth Amendment. United States v. McKenzie, 446 F.2d 949 (6th Cir. 1971).[7] Similarly, delay in execution of the warrant does not render inadmissible evidence seized, absent a showing of prejudice to the defendants resulting

from the delay. United States v. Harper, 450 F.2d 1032 (5th Cir. 1971). Finally, the return of a warrant has been held to be a ministerial task, and failure to include an item in the inventory attached to the return does not require suppression of the particular item. United States v. Moore, 452 F.2d 569 (6th Cir. 1971), cert. denied, 407 U.S. 910, 92 S.Ct. 2435, 32 L.Ed.2d 684 (1972).

In the context of electronic surveillance, we are aware that this court has held that a "complete and deliberate failure to file any inventory" is not merely a failure in a "ministerial" aspect of the surveillance. United States v. Eastman, 465 F.2d 1057 (3d Cir. 1972). In suppressing evidence in *Eastman,* we pointed out that "[t]he touchstone of our decision on this aspect of the case at bar is not one in which an inventory was delayed but rather is one in which specific provisions of Title III were deliberately and advertently not followed." 465 F.2d at 1062. Suppression was mandated by 18 U.S.C. § 2515 which "imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter." 1968 U.S.Code Cong. and Admin. News, p. 2184. In United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971), Judge Weis distinguished the case of delay in filing notice after the surveillance had been completed from the facts of *Eastman.* We believe this distinction is relevant here for it points out that in *Eastman* the failure to comply with the provisions of Title III was begun in the authorization stages of that surveillance and persisted throughout the entire procedure. The authorizing judge in *Eastman* expressly "waived" the post search notice provisions of Title III at the time he authorized the interception. *LaGorga* and *Eastman* make it clear, therefore, that the suppression in *Eastman* was statutorily mandated by its peculiar facts. Furthermore, any Fourth Amendment overtones of *Eastman* result

---

7. See also United States v. Averell, 296 F.Supp. 1004 (E.D.N.Y.1969) (two and one-half year delay in filing warrant return and inventory).

not from post-search ministerial delay or error, but from a deliberate attempt initiated prior to the search to avoid procedures mandated following the search.

It would appear that in the literal context of the Fourth Amendment, post-search notice of an electronic interception may properly relate only to the *issue* of "reasonableness" in the conduct of "searches and seizures." It is established federal practice that a traditional search warrant be returned to the issuing magistrate, F.R.Cr.P. 41(c), that the warrant may be executed and returned only within ten days after its date, that the person from whom or from whose premises the property was taken be given a copy of the warrant and a receipt, that an inventory be made which accompanies the return, and that the issuing authority upon request deliver a copy of the inventory to the person from whom the property was taken. F.R.Cr.P. 41(d). The unique nature of oral surveillance precludes utilization of identical procedures. Title III requires that an inventory be filed within a reasonable time but not later than ninety days after the filing of the application for an order. This inventory must include notice of the (1) fact of the entry of the order, (2) the period of interception, and (3) whether actual interception took place. Upon motion, the issuing court may make available such portions of intercepted communications "as the judge determines to be in the interest of justice." 18 U.S.C. § 2518(8)(d).

 We do not share the *Whitaker* court view that this procedure lacks the degree of promptness required by the Constitution. As we have observed, the constitutional standard for searches and seizures relating to both tangible objects and communications is the reasonableness of the governmental action. Only unreasonable searches and seizures are beyond the constitutional pale. A statute which requires an inventory to be filed within "a reasonable time" cannot, without more, be said to offend this test. If, in a given case, there is undue delay, that contention may be pressed in an appropriate averment alleging non-compliance with the statute. The vice of unreasonable delay is a factor to be measured within the contours of the statute, and should not be used to shape those contours into an unconstitutional form. Simply stated, the Congressional mandate places a premium on reasonable notice of the inventory. If this is found lacking, then there has been no compliance. Clearly, however, courts should exercise great care in granting extensions beyond the ninety-day period for the filing of inventories.

 The same analysis should apply to inspection of the contents of the interception, which Title III leaves to the discretion of the issuing court "as the judge determines to be in the interest of justice." Where there has been an improper denial of an appropriate motion for inspection, traditional safeguards of due process and orderly trial procedures exist to afford sufficient protection. As an abstract proposition, it may be desirable to mandate the inspection in all instances, but where there are oral interceptions there must be fealty to the concept of privacy.[8] Because any inspection is a publication, there must be concern for, if not concession to, the rights of those parties who figure or participate in the intercepted conversations, but who were not named

---

8. Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers engaged in the investigation or prevention of specified types of serious crimes, and only after authorization of a court order obtained after a showing and finding of probable cause.
Senate Report, 1968 U.S.Code Cong. and Admin.News, at p. 2153.

in the order. It was the Congressional wisdom to entrust the inspection, and therefore publication, to the courts as the subject of judicial decision. The parameters of "the interest of justice" within the statutory schema and the Federal Constitution remain to be fashioned on a case-by-case basis. For our immediate purposes we decide only that the Congressional decision to entrust this inspection to the judicial process is not offensive to the Fourth Amendment. The New York procedure condemned in *Berger* did not "provide for a return on the warrant thereby leaving full discretion in the officer as to the use of seized conversations of innocent as well as guilty parties." Berger v. New York, *supra*, 388 U.S. at 60, 87 S.Ct. 1873, 1884, 18 L.Ed.2d 1040. We conclude that this objection has been adequately negated by the provisions of Title III.

For these reasons, we reject the holding of United States v. Whitaker that Title III is unconstitutional, and thereby place ourselves in agreement with courts of appeals and district courts which have adjudicated the constitutionality of Title III.[9]

## III.

■■ Alternatively, appellants argue that the government failed to comply with section 2516(1), concerning who within the Department of Justice may authorize an application for electronic surveillance. This argument is premised on the fact that the Attorney General personally authorized the application, and indicated his approval by initialing a memorandum addressed to Deputy Attorney General Will Wilson which authorized him to perform the ministerial task of informing the particular trial attorney to submit the authorized application to the court. The applicant was sent a letter over Will Wilson's signature which was in fact signed by Henry E. Petersen, then Deputy Assistant Attorney General.[10] Whatever uncertainty previously attended the propriety of this specific procedure has now been resolved by this court adversely to appellants' contentions. United States v. Ceraso, 467 F.2d 647 (3d Cir. 1972); United States v. Ceraso, 467 F.2d 653 (3d Cir. 1972).[11]

9. In accord with our holding are United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); United States v. Cox, 449 F.2d 679 (10th Cir. 1971). All of the other district court cases hold that Title III is constitutional. United States v. Focarile, 340 F.Supp. 1033 (D.Md.1972); United States v. LaGorga, 336 F.Supp. 190 (W.D.Pa.1971); United States v. King, 335 F.Supp. 523 (S.D.Cal.1971); United States v. Lawson, 334 F.Supp. 612 (E.D.Pa.1971); United States v. Becker, 334 F.Supp. 546 (S.D.N.Y.1971); United States v. Perillo, 333 F.Supp. 914 (D.Del. 1971); United States v. Leta, 332 F. Supp. 1357 (M.D.Pa.1971); United States v. Scott, 331 F.Supp. 233, 238–241 (D.D.C.1971); United States v. Cantor, 328 F.Supp. 561 (E.D.Pa.1971); United States v. Sklaroff, 323 F.Supp. 296 (S.D. Fla.1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla.1970), reversed on other grounds sub nom. United States v. Robinson, 468 F.2d 189 (5th Cir., Jan. 12, 1972), rehearing en banc granted, 468 F.2d 194 (5th Cir., July 21, 1972).

The Supreme Court has discussed Title III, but has not yet passed on the con-

stitutionality of the Act. See Alderman v. United States, *supra*, 394 U.S. at 175, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972); United States v. United States District Court for the Eastern District of Michigan, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed. 2d 752 (1972).

10. Not included in these circumstances is the procedure by which Sol Lindenbaum acted for the Attorney General in authorizing the application which is now *sub judice* before this court in United States v. Cihal, No. 72–1201 en banc.

11. Section 2518(1)(e) requires that each application for an order authorizing telephone interception include:

a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and

## IV.

■ Appellants contend that the indictment listed 19 overt acts involving telephone calls none of which were specifically stated to be interstate. Proof at trial showed that 6 of the telephone calls in which Cafero received the "number" were transmitted within thirty minutes of the availability of the race results from Florida.[12] From this evidence, the government requested the jury to draw the inference that these calls were interstate. The jury was repeatedly instructed that they must find an interstate telephone call by a member of the conspiracy in order to convict. We are satisfied that the jury properly weighed the evidence and drew the appropriate inference. Moreover, we are satisfied with the disposition of this point by Judge Fullam.[13]

## V.

■ We have examined appellants' other contentions, including those relating to the reception of evidence, and find them to be without merit. We have concluded that the language of the intercept order, "intercept wire communications of Joseph E. Cafero, and unknown others, *from* the telephone facilities" (emphasis supplied), includes incoming as well as outgoing telephone calls. Evidence of bribery of local police officials was properly introduced not to show a mere propensity or disposition to com-

---

the action taken by the judge on each such application; . . .

In his application to Judge Lord, Mr. Henderson stated:

No other application for authorization to intercept wire or oral communications from the above-described or any other facility has been made in connection with the instant investigation.

The affidavit of an FBI agent, which was incorporated by reference into the application, indicated that information relevant to this investigation had been obtained from a prior wiretap authorized as part of a separate investigation on a different telephone used by another individual, Monzelli.

Because certain information relevant to the Cafero investigation was acquired from the Monzelli wiretap, appellant argues that the applicant's statement to the issuing court violated the Act, and hence the intercepted material should be suppressed as a violation of § 2518(1)(e). The Monzelli wiretap did not relate to the same facilities and could be considered a separate investigation. Irrespective of Mr. Henderson's oral statement, however, the supporting affidavit disclosed the Monzelli wiretap. Therefore, even if the statement by Mr. Henderson were technically incorrect, any possible error was cured by the disclosure of the other wiretap by the affidavit incorporated in the application.

12. See note 1, *supra.*

13. Unquestionably, the indictment is poorly drawn, in that while charging specifically some 19 telephone calls as constituting overt acts in carrying out the conspiracy charged, the indictment does not allege that any of these telephone calls were interstate. It can be argued that the indictment may have been drawn on the theory that any use of the telephone, even for purely local calls, would make out the offense charged, since the telephone is a facility used in interstate commerce. United States v. De Sapio, 299 F.Supp. 436 (S.D.N.Y.1969), holds that an actual interstate communication must be found, rather than merely local use of a facility which is sometimes used in interstate commerce; and the present case was submitted to the jury in recognition of this principle.

While, again, the issue is not entirely free from doubt, I have concluded that the indictment does adequately charge the crimes defined by the statutes in question. The pertinent language of Count 1 reads, "it was a purpose of the conspiracy that the defendants did use and cause to be used a facility in interstate commerce, namely the telephone, with the intent to carry on and facilitate the carrying on of an unlawful activity, to wit: a business enterprise involving gambling [in violation of state law]." The second Count charges that the defendants "used or caused to be used facilities in interstate commerce, namely the telephone . . ." with the same intent. I believe the language of the indictment can properly be interpreted as containing all of the elements of the crimes charged. It is, of course, entirely clear that all of the defendants, in the course of the extensive pre-trial proceedings, were fully apprised of the precise nature of the government's case, and of the factual issues they would be required to meet.

mit a crime, but for purposes of identification and to prove the conspiracy. The evidence was admissible under the law of this circuit for such a limited purpose. See Judge Biggs' authoritative analysis in United States v. Hines, 470 F.2d 225 (3d Cir. 1972). We hold further there was no abuse of the trial court's discretion in admitting newspaper clippings, in allowing testimony based on racing information contained in those clippings and the "Daily Racing Form," and in permitting an FBI agent to testify as an expert witness on gambling matters.

The judgments of conviction will be affirmed.