**UNITED STATES of America**
**v.**
**Anthony Joseph ACON et al.**
**Crim. A. No. 72–193.**

United States District Court,
W. D. Pennsylvania.
Nov. 19, 20, 1975.

See also 3 Cir., 513 F.2d 513.

Stephen I. Goldring and Michael Lesniak, Sp. Atty., U. S. Dept. of Justice, Blair Griffith, U. S. Atty., Pittsburgh, Pa., for plaintiff.

James K. O'Malley, Pittsburgh, Pa., for Acon, D'Angelo and Ciamacco.

Herbert B. Lebovitz, Pittsburgh, Pa., for Fritz.

H. David Rothman, Pittsburgh, Pa., for defendant Hineman.

John Hudacsek, Jr., Beaver Falls, Pa., for Panzanella.

John L. Doherty, Pittsburgh, Pa., for Nahas.

Thomas A. Livingston, Pittsburgh, Pa., for Ayoob.

## OPINION

WEBER, District Judge.

Defendant Michael Ciamacco, Jr. has moved to suppress certain telephone conversations intercepted by the government proposed to be introduced by it in the prosecution of the above case.

These involve six interceptions of calls between Michael Ciamacco, Jr. and phones registered to the following parties on the following dates:

| | | |
|---|---|---|
| 12–11–71 | D'Angelo | Phone No. 643–8168 |
| 12–18–71 | D'Angelo | Phone No. 643–8168 |
| 12–19–71 | D'Angelo | Phone No. 643–8168 |
| 1–22–72 | Acon | Phone No. 643–8201 |
| 1–24–72 | Acon | Phone No. 643–8200 |
| 2–15–72 | Acon | Phone No. 643–1407 |

The grounds of the motion are that Defendant Michael Ciamacco, Jr. was not identified in the original application or any subsequent application or any of the court orders as a person whose communications were to be intercepted, despite evidence that he was not among "others as yet unknown".

The orders under which the above interception were made were issued:

12–9–71 for the following telephones:
774–8488 )
774–1821 ) registered to Rockliffe Fritz
643–8168 ) registered to Mrs. Louis (Madeline) D'Angelo.
643–4396 ) registered to Louis D'Angelo deceased husband of Madeline.
1–19–72 for the following telephones
375–7694 (registered to Jack Gelsthorpe)
643–1407 (registered to Anthony Acon residence)
643–8200–01–02–03 (registered to Acon Pontiac)
·2–9–72 Order continuing the interception of the Acon telephones.

The application of December 9, 1971 was made to intercept communications of Anthony "Tony" Acon; Rockliffe "Rocky" Fritz; Robert "Bobby" Ciamacco, Charles Belas, Madeline (Mad) D'Angelo and "others as yet unknown".

The affidavit in support of the application listed, inter alia, that one informant had told the affiant that Mad D'Angelo lays off excess numbers play

taken by her, Fritz and other members of the organization with "Bobby" and "Mike" Ciamacco in McKees Rocks, Pennsylvania.

Further in support of the application the government represented that telephone company toll records showed numerous calls from the "Bobby" Ciamacco residence to both telephones at the D'Angelo residence. "Bobby" Ciamacco is also listed in the affidavit as being identified in unrelated gambling investigations as well as the subject of a search and seizure by the state police.

Thus, at the time of the first application to the court, the only mention of Michael Ciamacco, Jr. was the single informant's statement regarding Mad D'Angelo's layoffs with "Bobby" and "Mike" Ciamacco.

The statute, 18 U.S.C. § 2518(1)(b)(iv) requires that the application for and order authorizing an interception shall include:

"IV. The identity of the person, if known, committing the offense and whose communications are to be intercepted.",

and the court order shall specify this.

This requirement of particularity in cases involving wiretapping was developed by the Supreme Court in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 [1967], and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 347, 19 L.Ed.2d 576 [1967], prior to the enactment of the present statute, and was specifically adopted by Congress in its attempt to limit this activity to carefully controlled and circumscribed procedure, which the courts have continued to require. See *United States v. Cafero*, 473 F.2d 489 [3rd Cir. 1973].

While the statute allows the interception of unidentified persons the question present here is whether Michael Ciamacco, Jr. is within this category, in view of the evidence developed here.

The government did have some information from one informant that a "Mike" Ciamacco was part of the Acon gambling operations. He was not named as a person whose conversations were to be intercepted.

We believe that the affidavit shows that while there was probable cause to believe that both "Bobby" Ciamacco and "Mike" Ciamacco were engaged in the gambling operation, there is nothing to show that both "Bobby" and "Mike" would be heard over the telephones. In fact, the telephone toll records also recited in the affidavit show only calls between the D'Angelo residence and the "Bobby" Ciamacco residence.

The first three interceptions of defendant Michael Ciamacco, Jr. were made under the authority of the original court order of 12-9-71. The first interim report to the court from Attorney Bergstrom of the United States Department of Justice on 12/12/71 makes mention of the first call, from an individual identified as "Mickey" to Madeline D'Angelo giving her totals for four writers. The second interim report from Attorney Bergstrom on 12/20/72 recites that continuation of the intercepts was necessary to identify all the conspirators, specifically the one identified only as "Mickey".

At the evidentiary hearing Agent McNeil testified that at the time of the probable cause affidavit the information as to "Mike" Ciamacco was taken by him to mean Michael Ciamacco, Sr., the father of the present defendant. This supports the conclusion that at the time of the first intercept order the government was not aware of the likelihood of either the involvement of Michael Ciamacco, Jr. in the gambling operation or the likelihood of his being overheard on the telephone. By the time of the application for extension of the first interception on December 23, 1975 the United States had no reason to believe that Michael Ciamacco, Jr. would be using the telephones listed, because "Mickie" was still unidentified, and the extension was applied for only with respect to the telephones of Rockliffe Fritz. No connec-

tion of any of the Ciamaccos to Fritz had ever been suggested.

In *United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 [1974] the Court required the naming of the specific persons in the wiretap application only when the law enforcement officials believe that such individual is actively committing one of the offenses specified in the statute. (While the government knew that Minnie Kahn would probably use the phone in the Kahn residence, it did not know that she would use it to commit the offense). The Court rejected the argument that one who was "discoverable" by further investigation of present leads must be included. Thus in the present case there was no requirement that the government conduct further investigation of "Mike" Ciamacco to insure that they had probable cause to name him as a person to be intercepted. It was otherwise with "Bobby" Ciamacco because a pen register had established calls between him and Madeline D'Angelo, and he was identified with gambling otherwise.

In *United States v. Bernstein,* 509 F. 2d 996 [4th Cir. 1975] it was found that the government knew of Bernstein's involvement in the offense but not that he might use the phone which was the subject of the wiretap, at the time of the first application. But by the time of the second application Bernstein had been identified as a person whose calls were likely to be intercepted, and they failed to mention him in the application. The court held that the government cannot, by failing to put all it knows into an application, avoid identifying a probable criminal user of the telephone. It suppressed the later interceptions only.

In the present case the first three intercepts of defendant Michael Ciamacco, Jr. were under the original order. On the date of the last interception of these three, 12–19–71, according to the interim report of 12–20–71, the identity of "Mickey" is still undetermined.

The second set of three intercepted calls of Michael Ciamacco, Jr. were from the Acon telephones, and the probable cause affidavit of January 19, 1972 did not make a connection between Acon and Michael Ciamacco, Jr.

In summary we believe the following conclusions may be drawn from the evidence presented. The government had probable cause to believe that Robert "Bobby" Ciamacco was engaged in the gambling activity and was a person who might be overheard on the D'Angelo telephones to be intercepted because of information from one informant, prior telephone company records of toll calls, prior interceptions of telephone calls in unrelated investigations, and information from a state police search and seizure. They had no such information on Michael Ciamacco, Jr. except for the mention of the name "Mike" Ciamacco by the informant in connection with "Bobby" and "Mad" D'Angelo.

The agent making the affidavit testified that he would have expected to hear calls from "Mike" on these phones, because of the informant; he understood this to mean Michael Ciamacco, Sr., the father of the defendant.

Ultimately, when the person intercepted on the Robert "Bobby" Ciamacco telephone calls is identified as "Mickey" the government agents still are unable to identify him fully without further intercepts.

We distinguish the holdings of *United States v. Moore,* 168 U.S.App.D.C. 227, 513 F.2d 485 [1975] and *United States v. Donovan,* 513 F.2d 337 [6th Cir. 1975]. In *Moore* it was shown that the government had other evidence, as set forth in a contemporaneous independent application of the defendant's probable use of the telephone. The court held that

"[T]he test for probable cause is an objective one requiring an assessment of all information possessed by the Government at a particular moment in time." (513 F.2d p. 499)

In *Donovan* it was shown that the government had abundant prior evidence of telephone communications between

prime suspects and the moving defendant and knew the moving defendant to be involved in gambling operations. No such evidence concerning Michael Ciamacco, Jr. has been presented here.

The defendant Michael Ciamacco, Jr. has failed to produce or point to any other evidence tending to show that the government had probable cause to believe that he would be overheard over the monitored telephones of Fritz and D'Angelo. The result is entirely different with Robert "Bobby" Ciamacco, because the connection between the phone registered to him and the D'Angelo phones is already established.

Therefore, the interception of telephone calls of Michael Ciamacco, Jr. were properly made because there is no evidence that he was "a person, if known .. . . whose communications are to be intercepted."

The defendant Hineman has renewed his motion to suppress based on the insufficiency of the supporting affidavit to establish probable cause for the telephone interception order. Testimony was produced from the government agent who made the original affidavit. This revealed several facts upon which movant now relies:

1. The agent did not personally know of the reliability of three of the five confidential informants but relied on the information of another government agent for this statement.

2. The affidavit did not state that the informants were paid for their information.

3. The affidavit did not state that the informants had criminal records for violation of drug laws.

4. There was no independent investigation to verify the reliability of the third parties who gave the information to the informants.

5. There was no attempt to use conventional law enforcement procedures.

■ In evaluating these objections it is not our function to review the judgment of the District Judge to whom the application was made. We must determine whether the requirements of probable cause are now shown to be present, except where we find that there has been an intentional misrepresentation of fact to the judge approving the order.

In *United States v. Armocida*, 515 F. 2d 29, 41 [3rd Cir. 1975] the court found that there was no intentional omission of any material fact, and any facts omitted were not material to probable cause.

■ Under *United States v. Thomas*, 489 F.2d 664 [5th Cir. 1973] any intentional misrepresentation of a fact, whether or not material, makes a warrant invalid, but only a material misrepresentation will invalidate the warrant if it is non-intentional.

Defendant has not alleged nor shown any intentional misrepresentation or omission. Rather he focuses on the materiality of the omissions from the agent's affidavit. Our examination then is restricted to the question of whether the affidavit, as presented, is sufficient to establish probable cause.

■ The affidavit sets forth the criteria on which the agent evaluated the reliability of the informants. This is sufficient under *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637 [1969] and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 [1964]. The facts recited give support to the agent's belief in their reliability, and the omitted facts that he did not know three of them personally but depended on another government agent, that they were paid, and that they had criminal records for violation of drug laws did not affect his judgment of reliability in the light of the other information presented. Similarly, we do not deem it material that no effort was made to verify the reliability of the informant's informant because an affidavit may be based on hearsay, *Aguilar v. Texas*, supra, and there is no omission

of a material fact in failing to disclose that this was not done.

The affidavit recites that in the experience of the officer under the circumstances recited, normal investigative techniques were unlikely to succeed. In such case it would appear obvious that none were tried and the failure to mention this fact would appear to be not only immaterial, but useless.

We have previously ruled on the sufficiency of the probable cause affidavit and application on the motion of all defendants, except for the specific objections treated herein which were developed at the evidentiary hearing. We have found the affidavit otherwise sufficient to support probable cause in our Memorandum Order of September 23, 1975 for the reasons therein stated.

The Defendants have attacked the authorization procedure employed in the Office of the Attorney General and demand the right to confront the former Attorney General John Mitchell and the former Assistant Attorney General Henry Petersen, whose affidavits have been filed in this case.

This argument is made because defendants are not required to accept the truth of the affidavits without an opportunity to cross-examine the affiants, and also because they believe they are entitled to inquire into the actual exercise of the discretion which the statute reposes solely in the Attorney General or any Assistant Attorney General specifically designated by him for this purpose, under 18 U.S.C. § 2516.

■■ One point should be immediately set at rest. It is not the function of the Attorney General or his designated Assistant Attorney General to determine probable cause. Thus whether Mr. Mitchell or Mr. Petersen inquired into the reliability of informants or other matters involving probable cause are immaterial to our determination of the exercise of administrative discretion. This remains a judicial function and § 2518 contains extensive guidelines incor-

porating all the judicial standards previously announced controlling the exercise of judicial discretion in authorizing and supervising the interception. See *United States v. Cafero*, 473 F.2d 489, 496-7 [3rd Cir. 1973].

■ Nor do we find it material whether the Attorney General or his designate "simply reviewed reports of others or examined first hand materials". Nor is it material what particulars were included in the detailed recommendation.

The intention of Congress is reflected in the legislative history. The Report of the Senate Judiciary Committee recited that the statute,

"(1) . . . centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques." S.Rep. No. 1097, 90th Cong.2nd Sess. 96-97 [1968] U.S.Code Cong. & Admin.News 1968, pp. 2112, 2185.

This was recognized in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341, which concluded that "the mature judgment of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order." (pp. 515–516, 94 S.Ct. p. 1827).

■ It seems clear to us that Congress intended to limit the policy making power to a particular described individual, and strictly required that proof be shown on the face of the authorization that the action had been approved by the specifically named officer, and not by any other person, but it did not prescribe the mental process by which he came to his conclusion. A specifically named officer could determine the policy; the administration of that policy in accordance with the statute in the individual case was recognized as a judicial function.

Both *Giordano*, supra, and *United States v. Chavez*, 416 U.S. 562, 94 S.Ct.

1849, 40 L.Ed.2d 380 [1974] were concerned with the proper identification of the authorizing officer, as was the court of appeals in the prior opinion in this case. 513 F.2d 513 [3rd Cir. 1974].

In this case we have the evidence of the personal approval of the Attorney General by his initialed memorandum. While the boiler plate language of this approval reads that it specifically designated Henry Petersen, in accordance with Petersen's recommendation, to exercise the powers under the statute to apply for an order of court, the clear intent of the document is an approval.

There has been no allegation here that Mitchell did not personally act or sign the memorandum. His affidavit may contradict the institutional language of the Memorandum, but it clearly states that he approved requests to apply for interception orders and personally initialed the memorandum. His affidavit states that such Memoranda constituted notice to the Assistant Attorney General of his personal approval of the requests.

As the Court of Appeals found here, ". . . [W]e are not dealing with an *authorization* by an acting assistant attorney general. We are dealing with a *signature* on the authorization order placed there by an unqualified person". (513 F.2d at p. 516).

We believe that the approval of the Attorney General is established. Our only question remaining is whether the defendants are entitled to inquire into the mental process of approval.

We find this different from that presented by *United States v. Robinson*, 468 F.2d 189 [5th Cir. 1972], aff'd. en banc 472 F.2d 973, where the evidence showed that actual approval was by an officer other than the Attorney General, or the statutorily prescribed designate, and that the Attorney General had no authority to delegate this function to an other, even under the general statute providing for the delegation of the Attorney General's functions. 28 U.S.C. § 510.

In *Chavez*, supra, the Court recognized the procedure of accepting the personally acknowledged Memorandum of the Attorney General and his affidavit with respect thereto. In *United States v. Doolittle*, 507 F.2d 1368 [5th Cir. 1975] the District Court accepted the same evidence and refused further inquiry of the Attorney General:

"There is no constitutional infirmity in the district court's refusal to require more of the Attorney General on this narrow issue of fact." (p. 1371)

Accordingly, the motion for discovery and production of oral testimony of former Attorney General John Mitchell and former Assistant Attorney General Henry Petersen will be denied.